**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Raymond P. Moore**

Civil Action Nos.       17-cv-0721-RM-STV
                        17-cv-0976-RM-STV

Marc Kouzmanoff,

     *Plaintiff*,

     *v.*

Unum Life Insurance Company of America,
Thompson Reuters Holdings, Inc.,

     *Defendants*.

---

## ORDER

---

     This consolidated matter alleges failure to pay disability benefits and arises under the Employee Retirement Income Security Act ("ERISA") and other employer obligations. Plaintiff Marc Kouzmanoff is a former sales representative for Thompson Reuters Holdings, Inc. ("Thompson Reuters"). He developed diabetes in 2001 and, in 2016, applied for disability benefits pursuant to short-term and long-term plans ("STD Policy" and "LTD Policy") administered by Unum Life Insurance Company of America ("Unum"), asserting that performing the duties of his employment involved a high risk of injury or mortality due to his inability to control his blood sugar. Unum denied both benefit types, and Kouzmanoff filed separate actions against Thompson Reuters and Unum that have since been consolidated. (ECF No. 23.)[1] Kouzmanoff's pleadings square against Unum for breach of fiduciary duty under ERISA and Thompson Reuters for breach of contract and pursuant to the Colorado Wage Act.

---

[1]    Electronic Case Filing citations are to Case No. 17-cv-0721-RM-STV.

Before the Court is the administrative record in the Unum case (AR, ECF Nos. 69, 69-1, 75) and Thompson Reuters's Motion for Partial Summary Judgment (PSJ-Motion, ECF No. 78),[2] both of which are fully briefed. No party has moved to supplement the administrative record, or objected to the authenticity or veracity of any part thereof. These matters are ripe for review.

## I. BACKGROUND

Kouzmanoff, born on October 6, 1951, worked for Thomson Reuters for 30 years—from July 10, 1986 to October 6, 2016. (AR 5, 134.) As a "Field Account Manager," he communicated with and drove to Colorado businesses to present, demonstrate, and sell Thomson Reuters's legal, tax, and accounting products. (*Id.* at 444.)[3] The essential functions of the job included consistently achieving business objectives and sales revenue targets, working in a highly competitive environment under a quota system, managing relationships with high-end firms and corporations, working within urgent timelines, and travelling (sometimes overnight). (*Id.* at 166.) According to Kouzmanoff, he often worked 18-hour days but started voluntarily reducing his hours in either 2014 or 2015. (*Id.* at 346.)

### A. Relevant Disability Benefit Policies

This case centers on two separate benefit plans: the STD Policy and LTD Policy. The STD Policy—which is not a plan under ERISA—is self-funded by Thompson Reuters and "replaces a portion of [a claimant's] income in the event a sickness or injury prevents [him] from working for a period of time." (Statement[4] ¶ 1–2, ECF No. 86-1 (citing STD Policy, ECF No.

---

[2]    Thompson Reuters has not moved for summary judgment on Kouzmanoff's breach of contract claim.

[3]    As discussed further below, Kouzmanoff's last few months at Thompson Reuters were in an altered capacity.

[4]    For ease of reference, citations to the Statement of Undisputed Material Facts are to the PSJ-Motion Reply version, ECF No. 86-1. Because Kouzmanoff's response to the Statement began anew at "1" in labeling its paragraph numbers, the Court re-assigns them sequentially for ease of reference. For example, Kouzmanoff's first new factual statement ("Plaintiff worked for Thompson Reuters for 30 years. . . .") will be cited as Statement ¶ 9.

47-1, at 1).) However, the STD Policy does not provide benefits regarding a disability "caused by, contributed by, or resulting from [an] occupational sickness or injury." (STD Policy at 3.) Under the STD Policy, qualifying claimants are entitled to benefits of 100% of weekly earnings for the first six weeks of disability and 80% of weekly earnings for the following 19 weeks. (STD Policy at 5.) Pursuant to an elimination period, a claimant must be continuously disabled for seven days in order to be eligible for benefits. (STD Policy at 3.)

The STD Policy is administered by Unum: "When making a benefit determination under the [STD] Policy, U[num] has the exclusive and final discretionary authority to determine your eligibility for benefits and to interpret and enforce the terms and provisions of the [STD] Policy." (STD Policy at 8; *see also* Am. Compl. ¶ 4, ECF No. 55.) Whether or not Unum or Thompson Reuters is more appropriately dubbed its "administrator" in name,[5] Thompson Reuters *pays* Unum to administer the STD Policy (Statement ¶ 12) and the parties agree that Unum is its administrator. (Statement ¶ 2; ECF No. 85, at 2.) But while Unum administers the STD Policy, Thompson Reuters retained the exclusive right to discontinue it at any time: "Thompson Reuters reserves the right to modify, amend, suspend, or terminate, in whole or in part, any of the provisions of this Policy at any time for any reason or for no reason." (STD Policy at 1.) "[C]overage under the Policy ends . . . the date the Policy is cancelled[,]" but "if the Policy is cancelled, the cancellation will not affect a payable claim." (*Id.* at 2.)

---

[5]  In its Response to the PSJ-Motion, Kouzmanoff supplied an edited version of an Administrative Services Agreement between Thompson Reuters and Unum that is not a part of the administrative record. (ECF No. 85-2.) This Agreement labels Thompson Reuters the STD Policy "administrator." (Statement ¶¶ 4, 10). It further states that Thompson Reuters "shall notify Unum in writing if [Thompson Reuters] concludes that Unum is not processing claims as [Thompson Reuters] determines, in its exclusive discretion, is appropriate." The Court needs not determine what, if any, impact this language has on the parties' relationship because they agree that Thompson Reuters self-funds the program and pays Unum to administer it.

Kouzmanoff was also a beneficiary of the LTD Policy, of which Thompson Reuters was policyholder and Unum benefits provider. (AR 45; Unum Answer ¶ 2, ECF No. 13.) Like the STD Policy, the LTD Policy provides financial protection in the event of disability, but over a longer term. (AR 46.) Its elimination period is the later of 180 days or the end of short-term benefits under the STD Policy. (*Id.* at 47–48.) The LTD Policy offers employees several coverage options. Relevant here, benefits could include up to 66.6667% of monthly earnings—to a maximum benefit of $15,000 per month—for up to 42 months, minus any deductible sources of income. (*Id.* at 7, 11, 48, 61.)

Both policies set forth the relevant definitions and procedures governing a claimant's path to benefits. Under both, an employee is "disabled," and therefore entitled to benefits,[6] when Unum determines that he is "limited from performing the material and substantial duties of [his] regular occupation due to [a] sickness or injury; and [the employee] ha[s] a 20% or more loss in [ ] earnings due to that same sickness or injury." (Statement ¶ 5; AR 60.)

Both policies require the same information as proof of claim. A claimant must show (1) that he is under the regular care of a physician; (2) appropriate documentation of his weekly earnings; (3) the date his disability began; (4) the cause of his disability; (5) the extent of his disability, including restrictions and limitations preventing him from performing his regular occupation; and (6) the name and address of any hospital, institution or other treatment source, including all attending physicians' names and addresses. (AR 50; STD Policy at 7.)[7]

The policies provide appeal processes. Pursuant to the STD Policy, after making a negative determination, Unum provides a notice of denial in writing, giving the specific reason(s) for the denial; the policy provision(s) on which the denial is based; an explanation of a

---

[6]    The STD Policy, but not the LTD Policy, precludes benefits for work-related disabilities. (STD Policy at 3.)

[7]    There are slight additions in the sixth bullet point in the LTD Policy, which are reflected in the cited material.

right to appeal; and the claim review procedure. (STD Policy at 8.) The LTD Policy provides that, after denying a claim, Unum will provide that same information and, additionally, any material or information necessary to complete the claim and why such information is necessary; disclose any internal rule, guidelines, protocol or similar criterion relied on in making the adverse determination; and describe a claimant's right to obtain information about those procedures and the right to bring a lawsuit under Section 502(a) of ERISA following an adverse determination from Unum on appeal. (AR 82–83.) In support of a LTD Policy appeal, the claimant may submit new information, and Unum affords no deference to the prior determination. (*Id.* at 83.) Moreover, Unum reviews appeals via different personnel than who made the initial determination. (*Id.* at 83–84.)

### B. Kouzmanoff's Diabetes and Unum's Denial of STD and LTD Policy Benefits

In 2001, Kouzmanoff developed type-1 diabetes. (Unum Answer ¶ 31.) He has since treated with several physicians. Dr. Ken Cohen, M.D., reports that Kouzmanoff had worsening control of his diabetes from 2011 onward. (*Id.* ¶¶ 32–33.) On July 21, 2015, Kouzmanoff visited Dr. Cohen "to discuss DM[8] issues and worsening stress." (AR 111.) Per the medical notes from that day, Dr. Cohen suggested that Kouzmanoff change his work schedule, continue to work with diabetes education, and improve his insulin and carbohydrate management. (*Id.*) Kouzmanoff was to schedule a one-on-one evaluation at the Diabetes Center to improve his management and also to consider retiring in the coming fall, as his wife was encouraging him to do. (*Id.*) The notes explain that Kouzmanoff had frequent hypoglycemia, was sleeping poorly and constantly fatigued, and had suboptimal insulin management due to lack of standardized diet and over-treating. (*Id.*) The report further states that "[w]ith respect to his severe work stresses, he is

---

[8] "DM" or "diabetes mellitus" is commonly referred to as "diabetes."

planning on retiring at the end of the year, but is unwilling to consider a reduced work week, or an earlier retirement." (*Id.* at 112.)[9] Dr. Cohen's office forwarded these notes to Unum on April 18, 2016. (*Id.* at 114.)

On February 23, 2016, Kouzmanoff returned to see Dr. Cohen, who recorded:

> #1. Type 1 diabetes - unfortunately [Kouzmanoff's] control continues to be poor, and hopefully working with endocrinology this might finally improve, although he has failed multiple attempts at improved control working with both myself and our diabetes educators. . . .

> #4. Severe work-related stress - this clearly has an impact on his ability to control his diabetes and I agree with going on disability until his retirement in 8 months. . . .

> Control had been slowly improving with use of his CGM and hypos averaging about once weekly, usually at nighttime. Unfortunately his A1c remains poorly controlled at 8.9, and he had a recent admission for diabetic ketoacidosis . . . Current Lantus dose is averaging 20 units with his Humalog averaging between 15 and 20 units daily. He typically is low in the morning and control is poor throughout the day.

(*Id.* at 116.) The notes from this visit further indicate that Kouzmanoff's metabolic panel labs show a fasting glucose of 158 MG/DL. (*Id.* at 120.) Dr. Cohen forwarded this record to Unum on April 18, 2016. (*Id.* at 122.)

On March 17, 2016, Kouzmanoff initiated a STD Policy claim for "type 1 diabetes complications." (*Id.* at 92.) He initially provided documentation from Dr. Cohen, which stated that, based on the February 23, 2016 office visit, Kouzmanoff had ketoacidosis (diabetes mellitus type 1) that was not work-related, would undergo a treatment plan of "intensive diabetes

---

[9]   The Court is compelled to address Kouzmanoff's selective quoting of this and other material in his brief. (*Compare, e.g.*, ECF No. 64, at 4 *with* AR 111–12.) ***In this instance, not only are the quotations in the brief re-arranged, Kouzmanoff conveniently omits the sentence concerning work-related stress and that he is unwilling to consider a reduced work week—without so much as dropping an ellipsis or other alteration indicating that material has been deleted***. This is only one of several places in his brief where Kouzmanoff hides the ball. The Court finds specious Kouzmanoff's briefing practice of omitting inconvenient facts in this manner. "Counsel is reminded of his duty to act with candor toward the court." *Thomas v. Chester*, 561 F. App'x 656, 657 (10th Cir. 2014).

management," and "cannot drive or meet w/ clients." (*Id.* at 100–03.) Kouzmanoff stopped working on March 31, 2016. (*Id.* at 345.) But on April 4, 2016, he told his cardiologist Dr. Tatiana Tsvetkova, M.D., that he "feels good and has no complaints." (*Id.* at 146.) On April 14, 2016, Dr. Cohen provided a follow-up fax—also based on the February 23, 2016 visit—stating that Kouzmanoff "will not return" to work, either full or part time. (*Id.* at 108.)

On April 5, 2016, Unum interviewed Kouzmanoff pursuant to its claim process. (*Id.* at 104–05.) In response to an inquiry as to what had changed such that he could no longer work, Kouzmanoff answered[10] generally that the symptoms had been going on for some time; his attending physician believed he was killing himself at work and should seek stress counseling (which was ineffective); his blood sugar would rise even without food; he couldn't work at the end of the day and had to cancel work appointments; he had been in the intensive care unit for five days the preceding December,[11] during which his blood sugar was at least 1154; he cannot do 12 to 15-hour days anymore; he missed his sales quota for the first time in 30 years the previous year; and that he "hates to admit" that returning to work would not be good because he would not be able to hit the necessary sales numbers. (*Id.* at 104.) Kouzmanoff's brief omits the balance of this interview, during which he indicated that he has "[v]ery few sympt[oms] now, feels [ ] as good as when he was in his prime." (*Id.* at 105.)[12] He stated that he could return to work "tomorrow," "but couldn't continue thr[ough] it, would go back to the stress, looking at the numbers and results, too stressful." (*Id.*)

---

[10]   The Court notes that, although this material and much of what follows are hearsay-oriented notes from Unum and medical providers concerning what Kouzmanoff said at certain times, Kouzmanoff does not object to the authenticity, veracity, or relevance of the statements. Indeed, he incorporates these statements into his brief.

[11]   The Statement indicates that it is undisputed that Kouzmanoff received salary continuation plan benefits from "December 2015 to January 2016 when he missed work for a month due to his uncontrolled diabetes" and that those benefits were "paid and taxed as wages." (Statement ¶ 13.) However, the supporting documentation reflects compensation from the period 12/11/2016 to 12/24/2016. (ECF No. 42-2.) Upon review of the administrative record, it appears to the Court that Kouzmanoff actually only received STD Policy benefits covering the pay periods from 4/03/2016 to 4/30/2016. (AR 286–87). Those benefits were taxed as wages.

On April 14, 2016, Kouzmanoff visited an endocrinologist, Dr. Michelle Cassara, M.D., who assessed him as "Type 1 DM[] uncontrolled." (*Id.* at 159.) Here too, Kouzmanoff selectively edits from the notes. While the brief fairly recounts Dr. Cassara's overview of medication, dosage, overnight lows, and post-breakfast blood sugar elevations ("especially on days off"), it drops a convenient ellipsis to cover this: "[Kouzmanoff] has [a] new job at the golf course (very active with push mower) that he only started three days ago. Has not adjusted insulin doses for this." (*Id.* at 159.)[13]

On April 18, 2016, Kouzmanoff called Unum, stating that he had received his February 23, 2016 chart. Based on the information contained therein from Dr. Cohen, he stated that he would not be returning to work. (*Id.* at 122.) He added that he had gone to the hospital the preceding January, but now that he wasn't working his blood sugar was stabilizing, and he has no symptoms. (*Id.*) Finally, he said he "cannot do the mental part of the occ[upation.] [C]annot do the concentration, attention to detail, new product knowledge due to the condition." (*Id.*)

On April 20, in response to an information request from Unum asking what Kouzmanoff should or cannot do, Dr. Cassara responded that he had no limitations at all, including "no limitations on exercise. Should be able to test blood sugars up to 6 times per day. Needs to carry food with him." (*Id.* at 126, 134.) Also on April 20, 2016, Unum reviewed Kouzmanoff's STD Policy claim, including the notes and communications elucidated above. Among other findings, they concluded that Kouzmanoff has severe work-related stress that impacts his ability to control

---

Finally, the Court notes that there are no direct records of this December 30, 2015 to January 3, 2016 hospitalization. From the information available, it appears that Kouzmanoff was hospitalized for "diabetic ketoacidosis in the context of viral pericarditis," which is a heart condition and has low frequency of recurrence. (*See, e.g.*, AR 356–57, 378, 384, 471, 475, 483.)

[12] *See* note 9, *supra* (discussing duty of candor).

[13] *See* note 9, *supra*; *see also* AR 212–13, Clark Reader, *Lakewood Golf Course Enjoys Some Dedicated Caretakers*, Lakewood Sentinel (Aug. 4, 2016), https://lakewoodsentinel.com/stories/lakewood-golf-course-enjoys-some-dedicated-caretakers,233344.

his blood sugar. (*Id.* at 129.) And they noted that the "medical [records] reflect[] that the claimant has poorly controlled dm; however does not have much in the way in the way of DM related complications beyond mild peripheral neuropathy and ED."[14]

That day, Kouzmanoff wrote to Unum, from which his brief again employs selective quoting. (*Compare* AR 134 *with* ECF No. 64, at 6.)[15] According to the brief, Kouzmanoff's letter recounted more "uncontrollable" blood sugars over the preceding years, his "several episodes in 2015" that included dry heaves and exhaustion, days spent in the hospital and 8.8 A1c reading, and that stress was causing the uncontrollable blood sugar levels. (AR 134.) Notably, those difficulties were all in the *past* at the time of the letter. The brief omits his representations concerning the then-*present*, including, "I work out and lift weights almost every day. I eat well and don't smoke . . . and am healthy." (*Id.*) Also missing is his comment that he only planned to work until he turned 66-years-old, which was less than two years away. (*Id.*) He also asserted that it was only "this past year or 2 where I could no longer hold up the *mental* weight of my job." (*Id.* (emphasis supplied).) He went on: "Summary – I did my job well for 29 ½ years. Physically, I feel fine but what the stress has done to me is more than unhealthy, it is life threatening. Very few folks have been able to last this long in this job as I have done." (*Id.*)[16] Finally, the brief leaves out his affirmation that he had no additional medical records to support his claim outside those which had been provided by his doctors. (*Id.*)

On May 9, 2016, Unum personnel convened again (with different reviewers). (*Id.* at 162.) On May 11, Unum told Kouzmanoff over the phone that the "medical documentation does not

---

[14]    As noted below, Kouzmanoff affirmatively represented that he had no additional medical records to provide to Unum for review. (AR 134.) It is therefore highly misleading to argue, as Kouzmanoff does in his brief, that "Unum never requested or obtained blood sugar logs from Plaintiff at any time prior to denying the appeal of his LTD claim." (ECF No. 64, at 6; *see also* note 9, *supra* (discussing duty of candor).)

[15]    *See* note 9, *supra* (discussing duty of candor).

[16]    *See* note 9, *supra* (discussing duty of candor).

support inability to do his occupation." (*Id.* at 164.) Additionally, Unum noted that while Dr. Cohen suggested that severe work-related stress was impacting the diabetes, the STD Policy does not cover any disability caused or contributed to by, or resulting from, an occupational illness or injury. (*Id.*) Finally, Unum noted that it had approved his claim through the April 14, 2016 endocrinologist visit, but was unable to do so going forward. (*Id.*) As Kouzmanoff points out, Unum did not receive a summary of his job functions from Thompson Reuters until May 13, 2016. (*Id.* at 165–66.) But even after that, and reviewing those job functions, Unum found that "[m]edical data does not appear to support functional loss as of 4/15/16 and ongoing and it also appears that that his reported disabling condition was contributed to by an occupational sickness." (*Id.* at 190; *see also id.* at 192–96 (claim appeal review document).) As alleged in the Amended Complaint, Unum denied Kouzmanoff's STD Policy claim "on the basis that he was not disabled." (Statement ¶ 8.)

On June 24, 2016, Dr. Cohen provided Thompson Reuters with a letter giving approval for Kouzmanoff to return to work with certain restrictions. (Unum Answer ¶ 44.) Per the letter, Kouzmanoff would require frequent breaks to check blood sugar and time to manage it if elevated. (*Id.*) He would also need to avoid stressful situations or work—meaning not working on a production quota basis and keeping meetings with prospective customers to a time limit. (*Id.*) Dr. Cohen reiterated that such situations and related stress caused Kouzmanoff to lose track of blood sugar levels. Moreover, the letter asked Thompson Reuters to consider a reduction in hours, noting that it would be healthier for Kouzmanoff to maintain a "9 to 5 window." (*Id.*) In response, on July 1, 2016, Thompson Reuters offered Kouzmanoff modified employment that complied with the restrictions set out by Dr. Cohen. (AR 175.) In this "Sales Consultant" position, he would mentor and train new associates at his current base salary through September

30, 2016. (*Id.*) Kouzmanoff accepted this position.[17]

On July 8, 2016, Dr. Cohen provided Unum with another letter which stated:

> [Kouzmanoff] has been under my care for the past 12 years related to type 1 diabetes. Since about 2011, his diabetes control has been poor, with glycated hemoglobin levels in the 8–9 range. In addition to poor diabetes control, he has had frequent hypoglycemia and wide fluctuations in blood glucose readings. We have spent a considerable amount of time and effort working through our diabetes education center and my office in attempts to improve his diabetes control. There have been over 30 visits during this time. These attempts have largely failed related to his work circumstances. As previously noted there are several aspects of his job that have negatively affected his diabetes control. These include long hours, stressful sales presentations, and long periods of driving. Collectively, these have materially impaired his ability to adequately control his diabetes, and he has suffered from severe hypoglycemia as well as wide fluctuations in [b]lood glucose which have affected his mood and ability to concentrate. As a result of this, I consider him disabled for his current occupation. He had a single visit with an endocrinologist and the information from that visit is in conflict with the information noted above, but I do not feel that the endocrinologist had an adequate breadth or length of relationship which would allow the perspective to make these determinations.

Thompson Reuters terminated Kouzmanoff on October 6, 2016. (Unum Answer ¶ 47.)

Kouzmanoff also made a claim under the LTD Policy. During its investigation on this front, Unum's medical consultant James Haller, M.D., called Dr. Cohen to find out why he had assessed Kouzmanoff to be precluded from performing his occupational demands, stating that most individuals with diabetes and jobs requiring long hours are able to monitor their blood sugar and make appropriate adjustments which do not interfere with their work. (AR 368.) In response, Dr. Cohen did not disagree with that generalization, but maintained that Kouzmanoff had a "quadruple Type A personality," was "highly driven," "would constantly push himself to his limits," and would "stack his insulin doses and not eat for several hours and as a result would

---

[17]  In accordance with Dr. Cohen's work restrictions, Thompson Reuters had placed Kouzmanoff on unpaid Family and Medical Leave Act leave for 12 weeks, ending on July 1, 2016. (Statement ¶ 16.)

have hypoglycemic episodes which were a problem given his driving long distances." (*Id.*) He added that he saw Kouzmanoff on "May 31 and July 1 with treatment consisting of only minor dose adjustments in his insulin." (*Id.*; *see also id.* at 372–73 (follow up letter containing same information and requesting comment, if necessary, from Dr. Cohen).) Based on this and the information referenced above, Dr. Haller concluded:

> In summary, although the records reflect the insured has had poorly controlled diabetes, the evidence in the file supports that the widely variable blood sugar readings were largely the result of the insured's choice to over-treat hyperglycemia and not maintain a standardized diet despite recommendations to the contrary from his treating physicians. The lack of restrictions from his treating providers on his driving and other activities does not support that he would be precluded by a medical condition from the above referenced occupational demands. The 7/21/15 records of Kenneth Cohen M.D. reflect the insured was planning retirement and Dr. Cohen's 2/23/16 records reflect the insured was planning "to go on disability for the next 8 months prior to age 65 when he will retire."

(*Id.* at 379.) On October 21, 2016, Unum denied Kouzmanoff's application for benefits under the LTD Policy, and it denied his appeal on February 10, 2017. (*Id.* at 407–13, 481–87.) In its decisions, Unum considered the physical and cognitive demands of the position, finding that it involved frequent sitting, occasional standing, occasional walking, occasional lifting of up to 20 pounds, frequent reaching and handling, occasional keyboarding and stooping, influencing and dealing with people, and making judgments and decisions. (*Id.* at 482.)[18] Based on these demands—and a review of the entire record, including relevant LTD Policy provisions—Unum determined that "other than the period from December 30, 2015 to January 10, 2016 to allow him to recover from his hospitalization, there is no support [for a conclusion] that he would be limited from performing his regular occupation." (*Id.* at 483.) In addition to what has already

---

[18]   "As performed in this national economy, this occupation calls for a 'light' level of physical exertion, as that term is defined by the Dictionary of Occupational Titles." (AR 482 (additionally providing definitions of "occasionally," "frequently," and "constantly").)

been discussed, Unum noted that light levels of exertion are actually healthy; when not traveling, Kouzmanoff performed his work at a home office where he was free to monitor and regulate his blood sugar; he was not complying with his treatment regimen; there is no evidence that he remained restricted from driving or indeed had ceased driving; his work in the new position demonstrated his cognitive capacity; his golf course job evidences his physical ability; and there was no indication that he was being treated for a behavioral health condition related to his stress. (*Id.* at 483–84.) Unsatisfied with that decision, Kouzmanoff filed the instant lawsuit.

## II.  LEGAL STANDARDS

### A.  Summary Judgment

Summary judgment is appropriate only if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or is so one–sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable jury could return a verdict for either party. *Anderson*, 477 U.S. at 248. In considering whether summary judgment is appropriate, the facts must be considered in a light most favorable to the non-moving party. *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 461 (10th Cir. 2013) (citations omitted). "Statutory interpretation is a matter of law appropriate for resolution on summary judgment." *Thomas v. Metropolitan Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011).

### B. ERISA Benefits Determination

Kouzmanoff's claim against Unum is brought pursuant to 29 U.S.C. § 1132 (a)(1)(B), which he and Unum agree affords *de novo* review of the administrative record.[19] *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 102 (1989) ("[D]enial of benefits challenged under § 1132(a)(1)(B) must be reviewed under a *de novo* standard unless the benefit plan expressly gives the plan administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the plan's terms, in which cases a deferential standard of review is appropriate.").[20]

## III. ANALYSIS

### A. Motion for Partial Summary Judgment

The Colorado Wage Claim Act, Colo. Rev. Stat. Ann. § 8-4-101, *et seq.*, is designed to ensure that employees are paid fully for any compensation they are owed by their employers. Where an employer has refused or failed to pay an employee, the Act gives statutory rights to the employee which can result in substantial damages and penalties if the employer refuses to comply with those rights. The PSJ-Motion presents a narrow, specific legal question. Are short-term disability benefits, as provided for in the STD Policy,[21] "wages or compensation" under the Colorado Wage Act? The Court must endeavor to interpret the Act.

When construing a state statute, courts ascertain and give effect to the intent of the Colorado General Assembly and refrain from rendering judgments inconsistent with that

---

[19]  Scheduling Order, ECF No. 20, at 2–3 (both parties agreeing to *de novo* review).

[20]  Despite the parties' agreement, the Court is not convinced that *de novo* review is the correct standard here. The LTD Policy states that a person is disabled when "Unum determines" the same. (AR 60, 65.) This is the same sort of "discretionary authority to determine eligibility for benefits" that the Supreme Court comprehended in *Firestone* as not being subject to *de novo* review. While the Court will focus its analysis on whether Unum's denial of benefits withstands *de novo* review, it notes that Kouzmanoff's case unquestionably fails under the more deferential abuse of discretion standard.

[21]  While the Complaint against Unum equivocates the LTD Policy with the word "Plan," the Amended Complaint against Thompson Reuters defines "Plan" with respect to the STD Policy. (*Compare* ECF No. 1 *with* ECF No. 55.) Thus, there is no Wage Act claim related to the LTD Policy. In his Response to the PSJ-Motion, Kouzmanoff begins referring to the STD Policy as a "salary continuation plan." (ECF No. 85, at 1–2.)

intent. *Walker v. People*, 932 P.2d 303, 309 (Colo. 1997); *Farmers Ins. Exch. v. Bill Boom, Inc.*, 961 P.2d 465, 469 (Colo. 1998). To determine legislative intent, courts look first to the statute's plain language. *See Vaughan v. McMinn*, 945 P.2d 404, 408 (Colo. 1997); *City of Westminster v. Dogan Constr. Co.*, 930 P.2d 585, 590 (Colo. 1997). If courts can give effect to the ordinary meaning of words used by the legislature, the statute should be construed as written, giving full effect to the words chosen, as it is presumed that the General Assembly meant what said. *See Askew v. Industrial Claim Appeals Office*, 927 P.2d 1333, 1337 (Colo. 1996); *PDM Molding, Inc. v. Stanberg*, 898 P.2d 542, 545 (Colo. 1995); *see also* Colo. Rev. Stat. Ann. § 2-4-101 (1999) ("Words and phrases shall be read in context and construed according to . . . common usage."). If the statutory language is clear and unambiguous, courts need not look further. *See Town of Superior v. Midcities Co.*, 933 P.2d 596, 600 (Colo. 1997); *Boulder County Bd. of Equalization v. M.D.C. Constr. Co.*, 830 P.2d 975, 980 (Colo. 1992). However, where the words chosen by the legislature are unclear in their common understanding, or capable of two or more constructions leading to different results, the statute is ambiguous. *See Colby v. Progressive Cas. Ins. Co.*, 928 P.2d 1298, 1302 (Colo. 1996); *see also Robbins v. Chronister*, 435 F.3d 1238, 1241 (10th Cir. 2006) (discussing disregard for the plain meaning if construing a statute according to its terms would lead to an "absurd" result).

If a statute is ambiguous, courts move on to consider (a) the object sought to be attained; (b) the circumstances under which the statute was enacted; (c) the legislative history, if any; (d) the common law or former statutory provisions, including laws upon the same or similar subjects; (e) the consequences of a particular construction; (f) the administrative construction of the statute; and (g) the legislative declaration or purpose. Colo. Rev. Stat. Ann. § 2-4-203; *see also State v. Nieto*, 993 P.2d 493, 500–01 (Colo. 2000).

Beginning with the Act's plain language, "wages" or "compensation" means:

> (I) All amounts for labor or service performed by employees, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculating the same or whether the labor or service is performed under contract, subcontract, partnership, subpartnership, station plan, or other agreement for the performance of labor or service if the labor or service to be paid for is performed personally by the person demanding payment. No amount is considered to be wages or compensation until such amount is earned, vested, and determinable, at which time such amount shall be payable to the employee pursuant to this article.

> (II) Bonuses or commissions earned for labor or services performed in accordance with the terms of any agreement between an employer and employee;

> (III) Vacation pay earned in accordance with the terms of any agreement. If an employer provides paid vacation for an employee, the employer shall pay upon separation from employment all vacation pay earned and determinable in accordance with the terms of any agreement between the employer and the employee.

> (b) "Wages" or "compensation" does not include severance pay.

Colo. Rev. Stat. Ann. § 8-4-101(14). The parties agree, per the plain words of the Act, that no amount is a wage or compensation unless that same amount is "earned, vested, and determinable." But the Act also requires such an amount to be "for labor or service." Obviously, an amount—such as an inheritance or capital gain—could be earned, vested, and determinable without being owed for labor or service. Thus, to find that the STD Policy benefits are wages or compensation, a plain reading of the Act leaves Kouzmanoff with four hurdles to overcome: the amounts must be (1) for-labor-or-service, (2) earned, (3) vested, and (4) determinable. Thompson Reuters does not contest that the STD Policy benefits are determinable. (ECF No. 86, at 7.)

But there is some ambiguity in construing these terms in the Act. A symptom of this problem is that the Colorado courts themselves have somewhat collapsed the definitions of

"earned," "vested," and "determinable" into each other. *See Barnes v. Van Schaack Mortg.*, 787 P.2d 207, 209 (Colo. App. 1990) ("Under the Wage Claim Act, compensation is earned if it is vested pursuant to an employment agreement at the time of an employee's termination."); *Rohr v. Ted Neiters Motor Co.*, 758 P.2d 186, 188 (Colo. App. 1988) ("[Employee's] bonus was earned and, therefore, became vested and determinable as of the date of termination, even though not due and payable for two and one-half months thereafter.").[22] The Court thus moves beyond the Act's plain language to review its purpose and legislative history.

The "purpose of the [Act] is to ensure that *wages* are paid in a timely manner and to provide adequate judicial relief in the event *wages* are not paid. The [Act] should be liberally interpreted to serve its purpose. An employer is liable under the [Act] if the employer does not pay an employee wages he or she *earned*." *Fang v. Showa Entetsu Co.*, 91 P.3d 419, 421 (Colo. App. 2003) (internal citation omitted, emphasis supplied). After its enactment, parties hotly litigated whether compensation such as bonuses and commissions yet unpaid had been "earned" by the time of the employee's discharge or resignation within the meaning of the Act. *See, e.g.*, *Barnes*, 787 P.2d at 210 (concluding that a plaintiff loan originator did not "earn" commission compensation under the employment agreement for loans that closed in the months following his termination); *Rohr*, 758 P.2d at 187–88 (finding bonuses related to a profit-sharing plan to be "earned" months before they were required to be paid). In 2003, the Colorado General Assembly changed the definition of "compensation or wages" to include the "earned," "vested," and "determinable" requirements. At that time, it also added clear substantive provisions clarifying that commissions, bonuses, and vacation pay are wages—but only insofar as the same are earned "in accordance with the terms of any agreement" between the employer and employee. That

---

[22]  *Barnes* and *Rohr* both pre-date the amendments to the Act discussed below.

language signals the General Assembly's aversion to employees relying on indefinite, possible remittances. Thus, the amendments reinforced the view, expressed in *Barnes*, that the "Act does not itself create any substantive right to compensation for labor and services performed. Rather, it establishes minimal requirements concerning when and how *agreed* compensation must be paid." *Barnes*, 787 P.2d at 210 (emphasis in original).

Based on its review of the language, purpose, and history of the Act, the Court finds that Kouzmanoff has failed to show that STD Policy benefits are wages or compensation for two reasons. First, these benefits are not "amounts for labor or services performed." Thompson Reuters only pays monies pursuant to this policy to the extent that an eligible employee is unable to work. In opposite fashion to the profit-sharing bonuses at issue in *Rohr*, which increased as profits increased according to a pre-determined calculus, STD Policy benefits are negatively correlated to a Thompson Reuters employee's performance: Policy benefits rise as his productivity falls. As the STD Policy itself states, it is a non-wage cushion triggered if, and to the extent, an employee is unable to labor: STD Policy benefits "*replace*[] a portion of [an employee's] income in the event of sickness or injury." As Thompson Reuters points out, Kouzmanoff's claim fails because the disability benefits flow from his declared *inability* to work, rather than from labor or service pursuant to the employment contract. (ECF No. 78, at 3.)

Even were the Court to temporarily assume that STD Policy benefits are for labor or services, the Court does not view them as vest-able as a matter of law. As written, Kouzmanoff cannot ever have a "completed, consummated right for present or future enjoyment; not contingent; unconditional; absolute," *see Vested*, Black's Law Dictionary (10th ed. 2014), under the STD Policy because Thompson Reuters retained the unilateral right to cancel the policy at any time, for any reason or no reason at all. Disagreeing, Kouzmanoff likens these benefits to

vacation pay—which is not tethered to any concurrent work performed—now comprehended by the Act. (ECF No. 84, at 6 (citing Colo. Rev. Stat. Ann. § 8-4-101(14)(a)(III)).) But while vacation pay may be a cousin to the benefits at hand, it is a distant one. As discussed above, the Act was amended to include, as wages, "[v]acation pay *earned in accordance with the terms of any agreement*." (*Id.* (emphasis supplied).). Thus, the amendment established vacation pay as wages, but only insofar as the same is clearly provided for in a contract and accumulated as set forth therein. By contrast, the STD Policy—established unilaterally by Thompson Reuters—retains with its maker the power to cease short-term benefits altogether for any reason or no reason at all. These benefits are better viewed as status perks, such as free parking or a cafeteria, to which employees have no vested wage claim should an employer discontinue them. While Kouzmanoff was fortunate to work for a company that kept the temporary disability of its employees in mind with the STD Policy, to suggest that an employee has a vested statutory wage interest in unilaterally terminable benefits would enlarge the Act far beyond its language and purpose. Thus, summary judgment in favor of Thompson Reuters is appropriate on Kouzmanoff's claim under the Act.[23]

**B. Based on the administrative record, Kouzmanoff is not entitled to Benefits under the LTD Policy.**

Kouzmanoff argues two broad categories of wrongs committed by Unum in denying him LTD Policy benefits. First, he submits that Unum failed to consider his actual job duties in finding that he was not disabled. (ECF No. 64, at 13–15.) Second, he urges that his inability to work under a quota system, under stress, and with urgent time pressures rendered him disabled.

---

[23] The Court here only narrowly decides that STD Policy benefits are not wages or compensation under the Act. The mere circumstance that a company retains the right to discontinue a benefit does not mean, as a matter of law, that it may not be held responsible for its failure to provide an active benefit. Whether the facts ultimately show that Kouzmanoff was improperly denied short-term benefits by Thompson Reuters in this specific instance remains to be determined at trial.

(*Id.* at 15–20.) Because the Court reviews *de novo*, it first divines the scope of the coverage at issue before turning to whether the contents of the administrative record afford Kouzmanoff benefits pursuant to the same. On these inquiries, "the insured has the burden of showing that a covered loss has occurred, while the insurer has the burden of showing that a loss falls within an exclusionary clause of the policy." *Pitman v. Blue Cross and Blue Shield of Okla.*, 217 F.3d at 1291, 1298 (10th Cir. 2000).

Turning to the coverage, courts interpret insurances policies according to their plain meaning. *Kellogg v. Metropolitan Life Ins. Co.*, 549 F.3d 818, 829 (10th Cir. 2008). "[T]he proper inquiry is not what [the provider] intended a term to signify; rather, [courts] consider the common and ordinary meaning as a reasonable person in the position of the plan participant would have understood the words to mean." *Miller v. Monumental Life Ins. Co.*, 502 F.3d 1245, 1249 (10th Cir. 2007) (internal quotation marks and alterations omitted). Courts review an ERISA benefits denial claim as "they would any other contract claim by looking to the terms of the plan and other evidence of the parties' intent. If plan documents are reviewed and found not to be ambiguous, then they may be construed as a matter of law." *Cardoza v. United of Omaha Life Ins. Co.*, 708 F.3d 1196, 1203 (10th Cir. 2013) (citations omitted). "Ambiguity exists when a plan provision is reasonably susceptible to more than one meaning, or where there is uncertainty as to the meaning of the term." *Admin. Comm. of Wal–Mart Assocs. Health & Welfare Plan v. Willard*, 393 F.3d 1119, 1123 (10th Cir. 2004) (internal quotation marks omitted). The *contra proferentem* doctrine, which construes all ambiguities against the drafter, applies to *de novo* review of ERISA plans. *Miller*, 502 F.3d at 1249, 1253. "ERISA imposes upon providers a fiduciary duty similar to the one trustees owe trust beneficiaries. Just as a trustee must conduct his dealings with a beneficiary with the utmost degree of honesty and transparency,

an ERISA provider is required to clearly delineate the scope of its obligations." *Id.* at 1250 (internal citation omitted).

Under the LTD Policy, an employee is "disabled," and therefore entitled to benefits, if he is "limited from performing the material and substantial duties of [his] regular occupation **due to** [a] sickness or injury; and [the employee] ha[s] a 20% or more loss in [ ] indexed monthly earnings **due to** that same sickness or injury." (AR 60 (emphasis supplied).)[24] This standard requires not only that a claimant have a sickness, but that such sickness **cause** a performance limitation and at least a 20% reduction in earnings. (*See id.* at 50 ("Your proof of claim . . . must show . . . the cause of your disability.").) The Court finds that Kouzmanoff has failed overcome his hurdle to show—by a preponderance of the evidence—either that (1) that he had any occupational limitations at all or that (2) his diabetes is the cause of any would-be limitation.

### 1. Kouzmanoff has not proven occupational limitations.

The parties agree on the scope of Kouzmanoff's material and substantial duties as a Field Account Manager. He was to achieve business objectives and sales revenue targets within his geographic territory, work in a highly competitive environment under a quota system, build and maintain strong relationships, meet urgent deadlines, travel, and work from a home office. Unum analyzed these demands with respect to nationwide occupational standards, walking through the physical and cognitive requirements in terms of established U.S. Department of Labor national economy performance expectations.

As evidence of inability to rise to these challenges, Kouzmanoff only addresses his *specific* occupational demands, rather than those which are reflected by an analysis of his position in the national economy. Kouzmanoff provided medical records from three doctors—

---

[24] "Regular Occupation" means the occupation an employee is routinely performing as it is normally performed in the national economy. (AR 78.)

Dr. Cohen, who suggested that he should not perform the quota-related, stressful, or time-sensitive aspects of his specific occupation; Dr. Cassara, who found no occupational or physical limitations whatsoever; and Dr. Tsvetkova, who reported only that Kouzmanoff felt good and had no complaints. Kouzmanoff himself intimated on April 5, 2016 that he felt to be in his "prime" and would be ready to return to work "tomorrow." He even picked up a new job at the golf course and lifted weights, both of which further evidence his physical capabilities. Moreover, the record is bereft of facts undermining Kouzmanoff's mental acuity, nor does it illustrate any connection between diabetes and impaired cognitive function. That said, Kouzmanoff highlights what he believes to be a determinative fact: Thompson Reuters offered him a more relaxed replacement job. But that offering, provided in response to Dr. Cohen's assessment and Kouzmanoff's representation that he would not return to work in his previous capacity, does not bear on whether Kouzmanoff was *actually* capable—mentally or physically—of performing under stress or meeting the other cognitive demands of his prior role, and the Court does not assume that Thompson Reuters's made a correct evaluation. In fact, there is no evidence that the two roles demanded varying qualifications or abilities as they would be understood in the national economy—even if the latter just so happened to cause Kouzmanoff less stress. On the available record, the Court is not persuaded that any profession—"Field Account Manager," "Sales Consultant," or "Lakewood Golf Course Caretaker" included—is stress-free. And at any rate, "stress" is not a diagnosed disability for which Kouzmanoff claimed entitlement to benefits. Nor does the record reflect that he is more stress-prone than any abled laborer. Additionally, the record does not indicate that Kouzmanoff's diabetes, poorly managed as it was, is disabling: It had no recorded effect on his performance and certainly did not keep him from working, even in 2015, when he outright refused to reduce his hours, or in 2016, when

he was feeling in his prime. Moreover, there is no medical data showing continued poor blood sugar readings. Finally, Kouzmanoff has a not shown how he met the elimination period requirements—especially considering his representations about how healthy he felt at the same time he was claiming a right to disability benefits.

### 2. Even if the Court assumes Kouzmanoff had an occupational limitation, Kouzmanoff has not shown by a preponderance of the evidence that his diabetes was the limitation's source.

For a moment, the Court assumes that "the inability to work under a quota system [and] under stress and urgent time pressures" is a limiting disability. (ECF No. 64, at 15.) But here, what is this disability's cause? The Court has no doubt that Kouzmanoff's diabetes does not make his working life any easier. But Kouzmanoff says his diabetes "rendered him unable to endure these conditions of employment." (*Id.* at 16.) The Court first determines what level of causation the LTD Policy requires before turning to whether the record supports finding—by a preponderance of the evidence—that Kouzmanoff's diabetes caused him to be disabled.

In the ERISA plan context, the Tenth Circuit had found the phrase "due to" to be ambiguous: "The words do not speak clearly and unambiguously for themselves. The causal nexus of 'due to' has been given a broad variety of meanings in the law ranging from sole and proximate cause at one end of the spectrum to contributing cause at the other." *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1100 (10th Cir. 1999). In *Kimber*, the Circuit evaluated the district court's affirmation, under an arbitrary and capricious standard, of a plan administrator's determination that the "due to" language in the plan required disability be "due, at least in significant part, to" a mental condition. *Id.* In upholding the district court—and thus, the administrator—the Circuit found that when "given authority to interpret the plan language, and more than one interpretation is rational, the [interpreter] can choose any rational alternative.

Requiring a 'significant' relationship between the condition and the disability is a rational interpretation." *Id.* (further noting that the "due to" language was ambiguous and open to interpretation); *see also Kellogg v. Metropolitan Life Ins. Co.*, 549 F.3d 818, 832–33 (10th Cir. 2008) (discussing appropriate cause standard in ERISA plan context and noting the First Circuit's rejection of a complicated proximate cause analysis in favor of "viewing the policy as an ordinary policyholder would"). Here, reviewing *de novo*, the Court sits in the same capacity as the plan administrator in *Kimber* and may opt to analyze the "due to" language in the LTD Policy under any rational causation standard.[25]

Using the language discussed in *Kimber*, the Court sees no significant relationship between Kouzmanoff's diabetes and his professed occupational limitations. The causes proffered by both sides include diabetes, heart problems, work-related stress, a quadruple type-A personality, burnout, and improper disease management by Kouzmanoff himself. Without any evidence that Kouzmanoff was physically limited for the long term—and with substantial evidence to the contrary—the Court narrows on whether his diabetes bears a substantial nexus to his inability to cope with the cognitive pressures of his position.

Of the potential causation candidates, the Court views diabetes as the least fairly attributable source of Kouzmanoff's mental occupational difficulties. Tellingly, when Kouzmanoff left his position—only to start a side project cutting grass—he felt himself to be in excellent shape and healthy, but did not want to return for fear of continued stress, deadlines, and potentially missing out on a bonus. He was reticent to re-enter a stressful environment and hit sales figures because he knew—based on performance the previous year—the potential financial detriment of suboptimal achievement. The record does not reflect that his diabetes is the variable

---

[25]    *See* note 21, *supra* (questioning appropriate standard of review).

that governs whether or not he can work. As even his most sympathetic doctor maintained, Kouzmanoff's work-related stress, habits, diet, medication inconsistency, and highly driven personality (or some combination thereof) contributed to his diabetes mismanagement, and these are the only recorded factors which mark the difference between the person who was able to work and the one who claims he no longer can. Stated another way, Kouzmanoff had diabetes in 2014 and diabetes *and stress* in 2016, and it was only in 2016 when Kouzmanoff felt he had to cease working. Thus, to the extent he could be thought of as disabled, such disability was not the result of diabetes but of the other listed factor(s), and, as stated above, Kouzmanoff has not proved by any available method that he was disabled by reason of one of the same. At bottom, considering the whole administrative record and mindful of his burden of proof, Kouzmanoff has not shown to the Court, by a preponderance of the evidence, that the cause of his alleged work disability was anything other than work itself. Judgment in favor of Unum is appropriate.

## IV. CONCLUSION

For the foregoing reasons, the PSJ-Motion (ECF No. 78) is **GRANTED**. The administrative record (ECF Nos. 69, 69-1, 75) is resolved in favor of Unum. The Court **AFFIRMS** Unum's decision to not pay LTD Policy benefits to Kouzmanoff, and the Complaint against Unum (ECF No. 1) is **DISMISSED** with prejudice.

DATED this 15th day of March, 2019.

BY THE COURT:

RAYMOND P. MOORE
United States District Judge